## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| RASER TECHNOLOGIES, INC., and THERMO NO. 1 BE-01, LLC<br><br>                          Plaintiffs,<br><br>        vs.<br><br>UTC POWER CORPORATION and PRATT & WHITNEY POWER SYSTEMS, INC.,<br><br>Defendants. | Civil Action No. _____<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

Raser Technologies, Inc. ("Raser") and Thermo No. 1 BE-01, LLC ("Thermo," and together with Raser, the "Plaintiffs"), bring this complaint for damages and other relief against UTC Power Corporation ("UTCP") and Pratt & Whitney Power Systems, Inc. ("P&W").

## UTCP's "JOKE" ON RASER AND THERMO

1.      In early 2007, Raser was investigating what power generation technology was available for it to use at its geothermal fields in Nevada and Utah.  UTCP contacted Raser to pitch UTCP's PureCycle power generation units.  UTCP's PureCycle units are small generators, each with a net electrical output of about 225 kilowatts -- far below the 10 megawatt (10,000 kilowatt) power plants that Raser was planning to develop.  But UTCP told Raser that many of these small PureCycle units could be combined to build power generation plants on the scale Raser was planning, and that a PureCycle plant using multiple PureCycle units would be cheap to construct, efficient to run, and would work with the low and moderate temperature geothermal resources available to Raser.  On the basis of UTCP's statements, Raser, through its subsidiary

Thermo, purchased 50 PureCycle units to construct a 10 megawatt power generation plant at a geothermal field in the Utah desert.  The problem, however, was that UTCP's statements turned out to be false.  Indeed, UTCP's own scientists had told UTCP that the PureCycle units could not be combined to build a plant on the scale Raser was planning.  Relying on UTCP's statements, Raser spent over one hundred million dollars trying to make the plant function in the way UTCP had represented it would.  After P&W took over the PureCycle technology from UTCP, P&W's President met with Raser to discuss the problems with the Thermo plant.  At that meeting, P&W's President stated that the plant was "a joke," and that the idea of combining multiple PureCycle units to build a utility-scale generation plant was "nuts."  Unfortunately, the joke was on Raser and its shareholders.  In this action, Raser and Thermo seek to recoup the damages that UTCP's joke caused them.

## THE PARTIES

2.      Raser is a Delaware corporation with its principal place of business at 136 Main Street, Suite 600, Salt Lake City, Utah.  Raser is an energy technology company that focuses on the generation of power from geothermal resources.  Raser, directly or through its affiliates, holds the rights to a number of geothermal resources in the western United States.

3.      Thermo is a Delaware limited liability company with its principal place of business at 136 Main Street, Suite 600, Salt Lake City, Utah.  Thermo is a wholly-owned subsidiary of Raser.

4.      Raser and Thermo are debtors and debtors in possession in a Chapter 11 bankruptcy proceeding currently pending in the Bankruptcy Court of this District, Case. No. 11-11315 (KJC).

5.      Upon information and belief, Defendant UTCP is a Delaware corporation with its principal place of business at 195 South Governor's Highway, Windsor, Connecticut.  UTCP is a subsidiary of United Technologies Corporation..

6.      Upon information and belief, Defendant P&W is a Delaware corporation with its principal place of business at 400 East Main Street, East Hartford, Connecticut, and is the successor and/or successor-in-interest to UTCP.  P&W is a subsidiary of United Technologies Corporation.

## JURISDICTION AND VENUE

7.      The Court has subject-matter jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 1367.

8.      Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## FACTUAL ALLEGATIONS

### I.      UTCP's PureCycle technology and the Holy Grail of geothermal power

9.      On its website, the Geothermal Resources Council -- the geothermal industry trade association -- distinguishes geothermal wells (or "resources") according to the temperature of the well water:

> These resources can be classified as low temperature (less than 90•C or 194•F), moderate temperature (90•C-150•C or 194•F-302•F), and high temperature (greater than 150•C or 302•F).  The uses to which these resources are applied are also influenced by temperature.  The highest temperature resources are generally used only for electric power generation.  . . . . Uses for low and moderate temperature resources can be divided into two categories: direct use [for heating buildings, for example] and ground-source heat pumps [using the groundwater as a source of heat in winter and a heat sink in summer].

10.      For decades, the Holy Grail of the geothermal industry has been a way to utilize moderate and low temperature geothermal resources in utility-scale electric power generation.

UTCP claimed that its PureCycle technology had made this breakthrough.  In a 2007 paper

published in the Geothermal Resources Council's journal "Transactions," UTCP announced that:

> The PureCycle® geothermal system can operate on a wide range of geothermal resource temperatures starting as low as 165•F (74•C) -- **the lowest temperature demonstrated anywhere in the world.**

> By operating at lower temperatures than conventional geothermal systems, the PureCycle® geothermal system **enables geothermal wells deemed unproductive because they are below 300•F (149•C) to become viable energy sources.**

11.     UTCP claimed to have made this breakthrough by exploiting a thermodynamic

process known as the Rankine cycle, named after a Scottish engineer, William Macquorn

Rankine.  In the Rankine cycle, heat energy is converted into a different form of energy.  In

UTCP's PureCycle technology, the Rankine cycle begins when hot water from a geothermal well

is pumped into an evaporator, which is surrounded by tubes filled with a refrigerant.  Heat from

the hot water is transferred to the refrigerant, which reaches its boiling or "flash" point, turns into

vapor and expands, producing pressure.  The pressurized vapor then enters the power module

where it drives a turbine; the turbine spins a generator, which produces electricity.  After passing

through the turbine, the vaporized refrigerant enters a condenser where it is cooled with water

from a cooling tower and turns back into liquid.  The refrigerant is then pumped back into the

tubes surrounding the hot water from the geothermal well and the cycle begins again.

12.     UTCP's claim to have developed a technology to utilize moderate and low

temperature geothermal resources in utility-scale power generation was based on its development

of the PureCycle power generation units.  Each PureCycle unit is a self-contained electrical

generator capable of generating a net power output of about 225 kilowatts.  UTCP claimed that

by building a plant using a large number of these 225 kilowatt PureCycle units operating in

combination, the plant's output would be the sum of the output of each individual unit, and that a

plant with multiple units could economically and efficiently produce power on a scale that would

be suitable for sale to a regulated power utility, and with the qualities that utilities demand from such power (for example, uptime and redundancy).

## II.     UTCP's representations to induce Raser to purchase the PureCycle units

13.     By 2007, UTCP had spent millions of dollars to develop the PureCycle technology, but had sold only two or three of the units as small-scale, non-utility-grade generators, and needed a large order to make a return on this investment.  In early 2007, UTCP learned that Raser was exploring available technologies it might use to generate electricity from moderate and low temperature geothermal resources at various sites in Utah and Nevada.  On or around January 1, 2007, a UTCP employee, Halley Dickey, telephoned Raser to introduce the PureCycle technology to Raser.  On this call, and in subsequent meetings and phone calls (described below), Mr. Dickey and other UTCP employees made a series of representations to Raser about a utility-grade geothermal plant using PureCycle units that turned out to be false. These representations were as follows:

(a)     that multiple PureCycle units could be combined to generate utility-grade power on a commercially-viable basis, using the low and moderate temperature geothermal resources Raser had available for development;

(b)     that a power generation plant using multiple PureCycle units would be flexible -- i.e., would operate efficiently across a wide range of geothermal well temperatures and flows;

(c)     that a plant using multiple PureCycle units would have an efficiency greater than or equal to the industry benchmark power generation system;

(d)     that the installed cost of a power generation plant using multiple PureCycle units would be from $1,300 - $1,400 per kilowatt of capacity;

(e)     that a plant using multiple PureCycle units would be "extremely cost effective;" and

(f)     that a plant using multiple PureCycle units could be operated remotely.

14.    In the January 1, 2007 telephone call referenced above, Mr. Dickey told Raser's founder, Kraig Higginson, that UTCP's PureCycle units would work with moderate and low water temperatures; that a generation plant using multiple PureCycle units could be used for commercially-viable utility-scale power generation; and that such a plant would be "more efficient than anything out there." Mr. Dickey stated that a plant made up of multiple PureCycle units would work efficiently across a wide range of geothermal well temperatures and rates of flow, and that the installed cost for such a PureCycle plant per kilowatt of electrical capacity -- a crucial metric in the power generation industry -- would be less than any other geothermal power generation system on the market.

15.    Dickey's representations about a generation plant using UTCP's PureCycle units were of interest to Raser, and a meeting was scheduled with Dickey to hear more about the system. That meeting took place in Newport Beach, California, on January 18, 2007. In addition to Mr. Dickey and Mr. Higginson, Brent Cook, Raser's then-CEO, and Steve Brown, a Raser engineer, attended the meeting. During the meeting, Dickey said that he had previously been employed by Ormat Technologies, Inc., a leading manufacturer of geothermal power systems whose power generation technology is widely considered in the geothermal industry to be the benchmark against which other technologies are measured. Mr. Dickey told Raser that a generation plant using multiple PureCycle units would have an efficiency equal to, or greater than, an Ormat system. Mr. Dickey stated that the PureCycle units would allow Raser to develop utility-scale generation plants with the moderate and low well temperatures available to Raser,

and that such a plant would function efficiently over a wide range of well temperatures and flows.  Mr. Dickey also said that such a plant would be commercially-viable and that the installed cost for such a plant on the scale Raser was planning would be $1,300-1,400 per kilowatt of capacity.  Mr. Dickey said in addition that a plant using multiple PureCycle units would be so reliable that it could be operated remotely, thereby reducing operational costs (this same representation was made in a UTCP specification sheet for the PureCycle units, which stated:  "**Site Support:  no personnel required on site**.").  Finally, Mr. Dickey recommended that Raser read the 2007 paper quoted above which stated that a PureCycle system would allow moderate and low temperature geothermal resources to become viable energy sources.  The same paper also stated that UTCP's PureCycle technology "has created an **extremely cost effective geothermal power plant**."

16.     At the conclusion of the meeting in California, Mr. Dickey invited Raser to visit UTCP's headquarters in East Hartford, Connecticut.  Messrs. Cook, Higginson and Brown visited UTCP's headquarters on February 7, 2007, and met with UTCP President Jan Van Dokkum, Tom Clark, Mr. Dickey, and other UTCP representatives.  During this meeting, UTCP's Clark and Dickey repeated UTCP's earlier statements that a geothermal generation plant made up of multiple PureCycle units would enable Raser to utilize its moderate and low temperature geothermal resources as commercially-viable, utility-scale energy sources; that such a plant would operate efficiently across a wide range of water temperatures and flows; that the efficiency of the PureCycle technology was greater than that of any other power generation system available for the resources Raser was planning to develop; that the installed costs of a plant using multiple PowerCycle units would be lower per kilowatt of capacity than any other generation technology on the market; and that such a plant could be operated remotely.

17.     On March 15, 2007, Mr. Dickey met with Raser representatives at Raser's offices in Provo, Utah.  At that meeting, Mr. Dickey emphasized again the flexibility of the PureCycle technology and the ability of a generating plant using multiple PureCycle units to perform efficiently and in a commercially-viable and cost-effective way at moderate and low well temperatures.  In a March 28, 2007, telephone call between UTCP and Raser, UTCP representatives stated that the installed cost of a plant using multiple PureCycle units would be about $1,300 per kilowatt of capacity.

18.     UTCP employees repeated the representations described in ¶13 above on many other occasions.  Thus, for example, when Raser sought financing from Merrill Lynch to buy the PureCycle units and build the Thermo plant, in meetings and telephone calls in March and April 2008, UTCP employees, including John Fox, repeated to Merrill Lynch and Raser the representations about the performance and costs of the PureCycle units described in ¶13.  UTCP also repeated these same representations at meetings of the Geothermal Resources Council, including at the GRC annual meeting in October, 2008, in the presence of Raser employees.

19.     UTCP's representations were important to Raser, for Raser's decision concerning what power generation system it should purchase turned on how well the various available systems would function given the geothermal resources available to Raser and the cost of installing and running the system.  UTCP's representations about its PureCycle units, and how multiple units could be used in combination, directly and proximately caused Raser and Thermo to contract to purchase the PureCycle system from UTCP.  In reliance on UTCP's representations, Raser signed a Sourcing and Development Agreement with UTCP on April 6, 2007, in which, among other things, UTCP agreed to sell PureCycle units to Raser in three phases, on terms to be set out in the purchase contracts applicable to each delivery.  Also in

reliance on these representations, Thermo entered into a Purchase Contract with UTCP dated

August 31, 2008, to buy 50 PureCycle units to be used at a plant in Beaver County, Utah (the

"Thermo plant").  On the same day, UTCP and Thermo entered into a Service Agreement for the

Thermo plant.  In the Purchase Contract, UTCP gave a warranty as to the Thermo plant's power

output, and in the Service Agreement, UTCP gave a warranty as to the plant's uptime.

**III.    UTCP's representations were false and were known by UTCP to be false, and/or were made without belief in their truth, and/or were made recklessly.**

20.    UTCP's representations described above concerning its PureCycle units and a

generation plant using multiple PureCycle units were false, and UTCP knew them to be false,

and/or made them without believing them to be true, and/or made them recklessly.

21.    UTCP's representation that multiple PureCycle units could be combined to

generate power on a utility scale using the low or moderate temperature geothermal resources

that Raser was considering developing was false.  UTCP's representation was false because

multiple PureCycle units cannot be used in combination to generate power on a utility scale in a

commercially-viable way.  In addition, that representation was false because a power generation

plant using multiple PureCycle would require well water at a suitable temperature _and_ a large

flow of that water _and_ large quantities of low temperature water as a coolant.  Not only did

UTCP not inform Raser of these requirements, but in order to induce Raser to buy PureCycle

units for use at the Thermo plant, UTCP affirmatively told Raser that the PureCycle units would

make that plant's geothermal resources into a viable energy source despite the fact that, upon

information and belief, UTCP did not know the temperature or quantity of the geothermal

resources at the Thermo plant, and hence whether sufficient resources were available to support a

50 PureCycle unit installation.  In addition, UTCP represented to Raser that the PureCycle units

would make the plant's geothermal resources into a viable energy source even though UTCP

knew that the Thermo plant was to be constructed in the Utah desert, and therefore would not have sufficient cooling water for much of the year.  As Raser subsequently learned -- to its enormous detriment -- the PureCycle technology is crucially dependent on the availability of large quantities of low temperature cooling water to cool the refrigerant in the units after it has powered the turbines.  If the refrigerant is insufficiently cooled, it is unable to extract enough heat from the hot well water on its next pass through the unit to allow the PureCycle units to function properly.

22.     UTCP's representation that a power generation plant using multiple PureCycle units would be flexible -- i.e., would operate efficiently across a wide range of geothermal well temperatures and flows -- was false.  UTCP's representation about flexibility was of great importance to Raser because fluctuations in water temperature and flow can be encountered at any geothermal well field, and the ability to operate effectively and efficiently despite such fluctuations can have a significant impact on the viability of a project.  However, despite this representation, the PureCycle units at Thermo were unable to operate efficiently when fluctuations in temperature and/or flow were encountered.  A UTCP engineer finally admitted that UTCP's representation had been false, telling Raser long after the Thermo contract had been signed that the performance of the PureCycle units was actually "extremely sensitive" to even small variations in water temperature.

23.     UTCP's representation that a power generation plant using multiple PureCycle units would have an efficiency greater than, or at least equal to, the industry benchmark power generation system was false.  UTCP's representations about the efficiency of such a plant were important to Raser's decision to purchase the PureCycle units.  The term "efficiency" has a very specific meaning in the geothermal industry.  The energy content of water delivered to a

geothermal plant is measured in British Thermal Units ("BTUs") -- one BTU is the amount of energy required to raise the temperature of one pound of water by 1•F. The energy output of a power generator is measured in terms of kilowatt hours -- so an energy output of 1 kilowatt hour will run a 1 kilowatt device for 1 hour. The "efficiency" of a geothermal plant is thus the ratio between the geothermal energy contained in the water piped into the generator and the electrical energy generated from that water. The efficiency of a geothermal generator is dependent on the efficiency of its two component processes: the efficiency by which heat energy is extracted from the hot water ("extraction" efficiency), and the efficiency by which the extracted heat is converted into electrical energy by turning the turbine and generator ("cycle" efficiency). These two processes are controlled by fundamental principles of physics -- the first and second laws of thermodynamics, respectively. UTCP's representations about the efficiency of a plant using multiple PureCycle units compared such a plant to one using the Ormat geothermal power generation system -- the industry benchmark. But UTCP's statements that a plant using multiple PureCycle units had an efficiency greater than, or at least equal to, a plant using an Ormat system, were false. In particular, the cycle efficiency of a comparable Ormat system available at that time was over 50% greater than that of the PureCycle technology.

24.     UTCP's representation that the installed cost of a power generation plant using multiple PureCycle units would be from $1,300 - $1,400 per kilowatt was false. In fact, because of the many problems Raser faced when attempting to make the PureCycle units work at the Thermo plant, and UTCP's inability to solve those problems, the installed cost of the plant was over <u>eight times</u> more per kilowatt than what UTCP said it would be. Indeed, Raser believes that on an installed cost per kilowatt basis, Thermo is the most expensive geothermal plant ever built in the United States -- and perhaps the entire world.

25.     UTCP's representation that a generating plant using multiple PowerCycle units would be "extremely cost effective" was false.  The multiple PureCycle units installed at the Thermo plant were never able to generate the 10 megawatts of net output that the plant was intended to produce, and have had constant maintenance and reliability issues.  As a result, the costs of generating even a reduced output have been so extraordinarily high as to make the plant not commercially viable.  To take one example:  when Raser discovered that the available cooling water at the Thermo plant was insufficient to allow the PureCycle units to function properly, UTCP told Raser that it had to pump extra cooling water to the plant.   This required Raser to pay for the pumps, the plumbing, and the labor to install the pumps and plumbing.  Moreover, the additional pumps increased the plant's "parasitic load" -- that part of the power generated by the plant required to run the plant itself -- by about 40%.  Raser had to use a significant amount of the electricity generated by the plant to run these additional cooling pumps.

26.     In fact, there has not been a single month since plant start-up that all 50 of the PureCycle units at the plant have been operational.  Indeed, approximately 20% of the 50 units have been out of operation this summer, and many of these units have been down for six months or more.  To date, Raser has spent over $130,000 per unit on maintenance.  UTCP's representation that a plant using multiple PureCycle units would be "extremely cost effective" was simply not a true statement.

27.     UTCP's representations that a generating plant using multiple PureCycle units could be operated remotely and that "no personnel [are] required on site" were false.  UTCP's representations were important to Raser because operating costs are a vital factor in the economics of a relatively small power plant like Thermo.  In fact, a staff of over ten persons, has been unable to make the plant operate as it was supposed to operate.

28.     UTCP knew these representations to be false, and/or made them without believing

them to be true, and/or made them recklessly.  In a December 2010 letter, a P&W employee told

Raser that "the Thermo [plant] is a complex system of multiple units that have significant

interrelationships and therefore must be analyzed as a system."  But notwithstanding UTCP's

representations to Raser about the functionality and efficiency of a plant using multiple

PureCycle units, UTCP did not have any operational experience with such a "complex system of

multiple units."  In fact, the only operating data UTCP had was based on two or three stand-

alone PureCycle units generating electricity for direct use, not for commercial sale.  Thus at the

time that UTCP was telling Raser how well multiple PureCycle units would function as a system

to produce utility-grade electricity, UTCP had no experience with, and no data supporting, such a

"complex system of multiple units that have significant interrelationships."  In particular, UTCP

had no operational data or experience with such crucial matters as how fluctuations in well

temperature would impact the efficiency of a multi-unit system; how differences in the amount

of water flow would impact a multi-unit system; a multi-unit system's demand for cooling water;

the maintenance requirements and costs of such a system; and such a system's inability to be

operated remotely.

29.     Raser spent over $100 million attempting to make the PureCycle units at the

Thermo plant into a commercially-viable utility-scale power facility.  This money was spent in

vain: the PureCycle units did not function as UTCP had represented they would in order to

induce Raser to buy that system, and the units are now in the process of being scrapped.

## IV.     The "two-cycle" reconfiguration

30.     By the end of 2009, Raser was urgently asking UTCP to advise it how to make

the PureCycle system at the Thermo plant function properly.  UTCP told Raser that it should

change the configuration of the plant so that it operated in two cycles -- a "top cycle" and

13

"bottom cycle," such that hot water from the well is first sent through the top cycle PureCycle units, then sent through the bottom cycle PureCycle units to capture some of the remaining heat. UTCP's John Fox told Raser in a December 21, 2009 email that UTCP believed this two-cycle configuration should significantly increase the net output of the PureCycle units. Raser justifiably relied on this statement, and spent millions of dollars and thousands of hours of manpower converting the Thermo plant into a two-cycle configuration. But the new configuration did not increase the net output of the PureCycle system. Raser now believes that UTCP advised Raser to adopt the two-cycle configuration even though it knew that this configuration would not increase the plant's output, and that it would in fact damage the Thermo plant in the long run, even if it worked in the short term.

31.     UTCP told Raser that the two-cycle configuration would increase the plant's output: (a) as part of UTCP's continuing fraudulent conduct to convince Raser that the PureCycle units would generate utility-grade power from the geothermal resources available at Thermo on a commercially-viable basis and in a cost-effective and efficient way; (b) to conceal from Raser and Thermo the fact that its earlier representations about the PureCycle units had been false, and to prevent or delay Raser and Thermo from commencing an action seeking damages for the injuries caused by those misrepresentations; and (c) because even though UTCP knew that the two-cycle configuration would damage the plant in the long term, UTCP believed that the reconfiguration might increase the output of the plant in the short term, and thus might allow the plant to pass an upcoming contractual performance test that would entitle UTCP to a payout of approximately $5 million. As it happened, UTCP's recommended reconfiguration did not work even in the short term, and did not help UTCP pass the performance test. After the two-cycle reconfiguration did not work, UTCP informed Raser that it had miscalculated the

output of a two-cycle configuration, and that, correctly calculated, UTCP would have known that there would not be a material increase in power output.

**V.     UTCP owns up to its joke on Raser**

32.     After UTCP had been folded into P&W, P&W President Peter Christman came to Utah to see the Thermo plant and its problems.  After a tour of the Thermo plant, Mr. Christman stated that using PureCycle technology at the Thermo plant was "**nuts.**"  He stated: "**No one had any business building a plant like this,**" and added that using the PureCycle system at the Thermo plant was "**a joke**."  Moreover, Raser has learned, even UTCP's own scientists had warned UTCP before it sold the PureCycle units to Raser that multiple PureCycle units could not be combined to construct a commercially-viable utility-scale generation plant.

33.     Faced with Christman's admissions, and the failure of the two-cycle reconfiguration, Raser and Thermo discovered the stark truth:  UTCP's representations made to induce it to buy the PureCycle units had been false, and that it was not going to be possible for the PureCycle units at the Thermo plant to generate utility-grade power in a commercially-viable way.  Up to this point, UTCP's continued reassurances that the plant would work as promised had caused Raser and Thermo to believe that at some point the plant could work and that their continued investment in the plant could be recovered.  But with the failure of the two-cycle reconfiguration, and Christman's admissions, the truth became clear:  the PureCycle technology was not capable of producing a commercially-viable utility-scale generation plant, UTCP's representations had been false, and Raser and Thermo's reliance on those representations had caused them vast injury.

**Count I**
**FRAUD**

34.    The statements by UTCP to Raser described in the preceding paragraphs were false statements of fact made with the intent to induce Raser and Thermo to purchase UTCP's PureCycle units for use at the Thermo plant.  Raser and Thermo relied on UTCP's statements in agreeing to purchase UTCP's PureCycle units.  Raser and Thermo's reliance on UTCP's statements was reasonable and justifiable, not least because UTCP held itself out as having expert knowledge in the field of power generation and because of the reputation of UTCP and its parent, United Technologies, Inc., a Fortune 50 company, in the power generation industry.

35.    For the reasons described above, and on information and belief, UTCP knew that these statements were false, and/or it made those statements without believing in their truth, and/or it made those statements recklessly and without foundation, for the purpose of inducing Raser and Thermo to rely on them.

36.    UTCP's false statements induced Raser and Thermo to enter into the August 2008 Purchase Contract and Service Agreement for the PureCycle units at the Thermo plant.  Raser and Thermo spent over $100 million with the goal of getting the PureCycle system to work as UTCP had represented it would work.  UTCP's fraud caused Raser and Thermo over $100 million in damages.

37.    When UTCP entered into the Thermo Purchase Contract and Service Agreement, UTCP knew that it could not satisfy the performance and uptime warranties in those contracts, and/or made those warranties without believing it could satisfy them, and/or made those warranties recklessly.  Raser and Thermo justifiably relied on UTCP's fraudulent warranties and suffered over $100 million in damages as a consequence.

38.     UTCP made false statements to Raser about the consequences of reconfiguring the Thermo plant to a two-cycle system.  UTCP knew these statements to be false when it made them, and/or made those statements without believing in their truth, and/or made those statements recklessly and without foundation, but made them in order to conceal the fact that the representations UTCP made to induce Raser and Thermo to enter the Thermo contracts were false, and in order that UTCP would benefit from the plant passing the contractual performance test.  Raser reasonably relied on UTCP's false statements, and was damaged thereby.

**Count II**
**NEGLIGENT MISREPRESENTATION**

39.     The statements by UTCP to Raser described in the preceding paragraphs were false statements of fact made with the intent to induce Raser and Thermo to purchase UTCP's PureCycle units for use at the Thermo plant.  Raser and Thermo relied on UTCP's statements in agreeing to purchase UTCP's PureCycle units.  Raser and Thermo's reliance on UTCP's statements was reasonable and justifiable, not least because UTCP held itself out as having expert knowledge in the field of power generation and because of the reputation of UTCP and its parent, United Technologies, Inc., a Fortune 50 company, in the power generation industry.

40.     For the reasons described above, and on information and belief, UTCP had the means of knowing, should have known, and had a duty to know, that these statements were false.

41.     UTCP's false statements induced Raser and Thermo to enter into the August 2008 Purchase Contract and Service Agreement for the PureCycle system at the Thermo plant.  Raser and Thermo spent over $100 million with the goal of getting the PureCycle technology to work as UTCP had represented it would work.  UTCP's negligent misrepresentations caused Raser and Thermo over $100 million in damages.

42.     When UTCP entered into the Thermo Purchase Contract and Service Agreement, UTCP had the means of knowing, and/or should have known, and/or had a duty to know that it could not satisfy the performance and uptime warranties in those contracts.  Raser and Thermo justifiably relied on UTCP's negligent warranties and suffered over $100 million in damages as a consequence.

43.     UTCP made false statements to Raser about the consequences of reconfiguring the Thermo plant to a two-cycle system.  On information and belief, UTCP had the means of knowing, should have known, and had a duty to know that these statements were false when it made them, but made them in order to conceal the fact that the representations UTCP made to induce Raser and Thermo to enter into the Thermo contracts were false, and in order that UTCP would benefit from the plant passing the contractual performance test.  Raser reasonably relied on UTCP's false statements, and was damaged thereby.

**Count III**
**VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT**
**BY MAKING FALSE AND DECEPTIVE STATEMENTS**

44.     UTCP's false statements and fraudulent warranties described above, many of which were made in Connecticut or made in contracts governed by Connecticut law, violated the Connecticut Unfair Trade Practices Act's bar on unfair or deceptive acts or practices in the conduct of trade or commerce.  UTCP made these false statements and fraudulent warranties knowing they were false and unsupported, and/or with reckless disregard of their falsity, and/or despite having the means of knowing that they were false or unsupported.  As a consequence, UTCP's false statements and fraudulent warranties were immoral, unfair, deceptive and

18

unethical.  Raser and Thermo reasonably relied on UTCP's false statements and fraudulent

warranties to their detriment and injury.

**Count IV**
**BREACH OF CONTRACT**

45.     On August 31, 2008, UTCP and Thermo entered into the Purchase Contract for

the sale and purchase of 50 PureCycle units for the Thermo plant and a Service Agreement with

respect to those units.

46.     UTCP breached these contracts:

(a)     by providing Thermo with defective equipment that was not in accordance with

accepted industry standards and UTCP's own design specifications;

(b)     by failing to provide utility–grade equipment;

(c)     by failing to provide equipment that could pass the performance tests and uptime

warranties;

(d)     by not repairing or replacing defective and non-conforming equipment;

(e)     by failing to make adequate and timely repairs to the equipment, including repairs

to the turbines and heat exchange tubes;

(f)     by failing to replace leaking pumps and failing to repair refrigerant leaks;

(g)     by failing to provide the maintenance and system performance data that Raser

needs to operate the plant;

(h)     by advising Thermo to reconfigure the plant into a two-cycle configuration.

47.     Raser and Thermo have performed their obligations under the contracts in full,

and have been injured by UTCP's breaches of contract because the PureCycle units that they

purchased from UTCP did not work according to contractual specifications and because UTCP

did not fulfill its contractual obligations to correct deficiencies and make repairs.

### Count V
### VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT BY AGGRAVATED BREACH OF CONTRACT

48.      UTCP's breaches of the Purchase Contract and Service Agreement were wanton,

willful, unscrupulous and in bad faith, and thus in violation of CUTPA.  UTCP made warranties

in these contracts knowing it could not satisfy these warranties, and/or when it should have

known it could not satisfy these warranties.  UTCP refused to meet its contractual obligations by

first denying that it was obliged to remedy defects and make repairs, and later by telling Raser

that it would have to make these repairs at its own cost.  Then UTCP said that the Thermo plant

would function properly if Raser implemented a two-cycle configuration, even through UTCP

knew or should have known that this was false.  Finally, even when UTCP admitted that using

PureCycle units at the Thermo plant was "nuts" and a 'joke," it refused to meet its contractual

obligations because by then it knew that there was nothing it or anyone could do to make its

PureCycle units work properly.  UTCP's breaches of contract caused substantial injury to

Thermo.

### Count VI
### NEGLIGENCE AND GROSS NEGLIGENCE

49.      As the designer and manufacturer of the PureCycle units, UTCP owed Raser a

duty of care when it gave Raser advice about the optimal configuration of the PureCycle units at

the Thermo plant.  UTCP breached this duty of care by telling Raser that the plant would operate

better if Raser implemented the two cycle configuration because this recommendation was based

on a mistake in calculating the consequences of the recommended reconfiguration.  Raser

reasonably followed UTCP's advice, and UTCP's negligence and/or gross negligence was the

proximate cause of Raser spending millions of dollars to reconfigure the PureCycle system to no useful effect.

WHEREFORE, Plaintiffs request relief as follows:

(1)     Damages in an amount to be proved at trial;

(2)     Statutory, punitive and exemplary damages;

(3)     Attorneys' fees and costs of suit; and

(4)     Such other and further relief as the Court may deem just and appropriate.

Plaintiffs demand trial by jury.

Dated: September 1, 2011              BAYARD, P.A.
       Wilmington, Delaware

                                     */s/* Charlene D. Davis
                                     Neil B. Glassman (No. 2087)
                                     Charlene D. Davis (No. 2336)
                                     GianClaudio Finizio (No. 4253)
                                     222 Delaware Avenue, Suite 900
                                     Wilmington, Delaware 19899
                                     Telephone: (302) 655-5000
                                     Telecopier: (302) 658-6395
                                     Email: nglassman@bayardlaw.com
                                             cdavis@bayardlaw.com
                                             gfinizio@bayardlaw.com

                                             -and-

Brian V. Otero
Stephen R. Blacklocks
Ryan A. Becker
HUNTON & WILLIAMS LLP
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
Telephone: (212) 309-1000
Telecopier: (212) 309-1100
E-mail: botero@hunton.com
          sblacklocks@hunton.com
          rbecker@hunton.com

Counsel for Raser Technologies, Inc. and Thermo
No. 1 BE-01, LLC