**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CYRQ ENERGY, INC., f/k/a RASER TECHNOLOGIES, INC., THERMO NO. 1 BE-01, LLC, and RZTI LITIGATION, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> UTC POWER CORPORATION and PRATT & WHITNEY POWER SYSTEMS, INC., <br><br><br> Defendants. <br><br> UTC POWER CORPORATION and PRATT & WHITNEY POWER SYSTEMS, INC. <br><br> Counterclaim-Plaintiffs, <br><br> v. <br><br> CYRQ ENERGY, INC. f/k/a RASER TECHNOLOGIES, INC., THERMO NO. 1 BE-01, LLC, RZTI LITIGATION, LLC, VIA MOTORS, INC., KRAIG T. HIGGINSON AND RICHARD D. CLAYTON, <br><br> Counterclaim-Defendants. | Civil Action No. 1:11-cv-00768-GMS <br><br> DEMAND FOR JURY TRIAL |

## ANSWER AND COUNTERCLAIMS

Defendants and Counterclaim-Plaintiffs UTC Power Corporation ("UTCP") and Pratt & Whitney Power Systems, Inc. ("PWPS"; UTCP and PWPS are collectively referred to as "Defendants" in the Answer and as "Counterclaim-Plaintiffs" in the Counterclaims) hereby submit this Answer and Counterclaims with respect to the Complaint filed by Raser

Technologies, Inc. ("Raser") now known as Cyrq Energy, Inc., Thermo No. 1 BE-01, LLC

("Thermo") and RZTI Litigation, LLC (collectively, "Plaintiffs") dated September 1, 2011 (the

"Complaint").

<u>**ANSWER**</u>

Defendants, for their Answer to the claims alleged in the Complaint, state as follows:

1.      Defendants deny the allegations of Paragraph 1, except as follows.  Defendants

admit that UTCP's PureCycle units are small generators, each with a net electrical output of

about 250 kilowatts, provided that the units are supplied with adequate geothermal resources and

cooling water; that Thermo purchased 50 PureCycle units with respect to a construction of a

power generation plant in Utah; that UTCP's rights and obligations under its agreements with

Thermo and Raser were assumed by and assigned to PWPS; and that representatives of PWPS

including its president met from time to time with representatives of Plaintiffs.  Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations concerning

Raser's investigation into what power generation technology was available for it to use at its

geothermal fields in Nevada and Utah in early 2007 and therefore leave Plaintiffs to their proof.

2.      Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 2 and therefore leave Plaintiffs to their proof.

3.      Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 3 and therefore leave Plaintiffs to their proof.

4.      Defendants admit on information and belief that Raser and Thermo are debtors

and formerly were debtors in possession in bankruptcy cases pending in the United States

Bankruptcy Court for the District of Delaware, which are being jointly administered under Case

No. 11-11315 (KJC).  The remaining allegations of paragraph 4 are denied.

-2-

5.      Defendants admit that UTCP is a Delaware corporation with its principal place of business at 195 Governor's Highway, South Windsor, Connecticut, and that it is a subsidiary of United Technologies Corporation.

6.      Defendants admit that PWPS is a Delaware corporation with its principal place of business at 400 East Main Street, East Hartford, Connecticut, and that it is a subsidiary of United Technologies Corporation.  The remaining allegations of paragraph 6 are denied.

7.      Defendants admit the allegations in Paragraph 7.

8.      Defendants admit that venue in this District is proper under 28 U.S.C. § 1409. The remaining allegations in Paragraph 8 are denied.

9.      Defendants admit that the Geothermal Resources Council is a non-profit educational association for the international geothermal community and refer to the organization's website for the full and accurate contents thereof.

10.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence in Paragraph 10 and therefore leave Plaintiffs to their proof.  Defendants admit that Halley Dickey of UTCP published an article in the Geothermal Resources Council's journal "Transactions" in 2007, volume 31, entitled "Low-Temperature Geothermal Power Generation with HVAC Hardware," but deny that Paragraph 10 fully and accurately characterizes the contents of the article, which speaks for itself, and refer to the article for the full contents thereof.

11.     Defendants admit that the Rankine cycle is a thermodynamic process named after Scottish engineer William Macquorn Rankine; and that in the Rankine cycle, heat energy is converted into a different form of energy.  Defendants deny that the remaining allegations in Paragraph 11 accurately describe the Rankine cycle process as it applies to PureCycle

-3-

technology.  To the extent the first sentence in Paragraph 11 is intended to characterize the article by Halley Dickey published in "Transactions," Defendants deny that it fully and accurately characterizes the contents of the article, which speaks for itself, and refer to the article for the full contents thereof.  The remaining allegations in Paragraph 11 are denied.

12.     To the extent Paragraph 12 is intended to characterize the article by Halley Dickey published in "Transactions," Defendants deny that it fully and accurately characterizes the contents of the article, which speaks for itself, and refer to the article for the full contents thereof.  To the extent Paragraph 12 is intended to characterize statements otherwise made by UTCP, Defendants deny that the allegations fully and accurately characterize any such statements.  Defendants admit that each PureCycle unit is a self-contained electrical generator capable of generating a net power output of about 250 kilowatts, provided that the unit is supplied with adequate geothermal resources and cooling water.  Any remaining allegations in Paragraph 12 are denied.

13.     Defendants admit that affiliates of United Technologies Corporation spent millions of dollars in developing PureCycle technology; that in early 2007 there were communications between representatives of UTCP including Halley Dickey and representatives of Plaintiffs with respect to PureCycle technology; and that Mr. Dickey had a telephone conversation with a representative of Raser on or around January 1, 2007.  Defendants deny that the allegations in Paragraph 13 fairly or accurately characterize representations made by UTCP with respect to PureCycle technology and deny that Mr. Dickey or any other UTCP employee made any false representations, and refer to the terms of the Purchase Contract for the performance guarantees and operating parameters agreed upon by the parties.  Any remaining allegations in Paragraph 13 are denied.

14.     Defendants admit that Mr. Dickey had a telephone conversation with Mr. Higginson in or around January 2007.  Defendants deny that the remaining allegations in Paragraph 14 fully and accurately describe the telephone conversation between Mr. Dickey and Mr. Higginson.  Any remaining allegations in Paragraph 14 are denied.

15.     Defendants lack knowledge or information sufficient to form a belief as to the allegations in the first sentence in Paragraph 15 regarding Raser's interest in PureCycle units and the allegations in the fourth sentence in Paragraph 15 regarding Ormat Technologies, Inc., and therefore leave Plaintiffs to their proof.  Defendants admit that a meeting took place in Newport Beach, California on or about January 18, 2007; and that the attendees were or included Mr. Dickey and Messrs. Higginson, Cook and Brown.  Defendants deny that the remaining allegations in Paragraph 15 fully and accurately describe the communications between Mr. Dickey and Messrs. Higginson, Cook and Brown at the January 18, 2007 meeting.  Defendants deny that the allegations in the last sentence in Paragraph 15 fully and accurately characterize the contents of the 2007 article, which speaks for itself, and refer to the article for the full contents thereof.  Any remaining allegations in Paragraph 15 are denied.

16.     Defendants admit that Messrs. Cook, Higginson and Brown visited UTCP's headquarters in South Windsor, Connecticut on February 7, 2007 upon Mr. Dickey's invitation, and that they met with UTCP representatives including Messrs. Van Dokkum, Clark and Dickey. Defendants deny that the remaining allegations in Paragraph 16 fully and accurately describe the communications at that meeting.  Any remaining allegations in Paragraph 16 are denied.

17.     Defendants admit that Mr. Dickey met with Raser representatives at Raser's offices in Provo, Utah, on or about March 15, 2007.  Defendants deny that the allegations in the

-5-

second sentence of Paragraph 17 fully and accurately describe the communications at that meeting.  The remaining allegations in Paragraph 17 are denied.

18.     Defendants deny the allegations in Paragraph 18 except admit that in March and April 2008, there were various meetings and telephone calls between representatives of Raser and Merrill Lynch and UTCP employees including John Fox; and that UTCP employees attended the GRC annual meeting in 2008.  Defendants further deny that the allegations in Paragraph 13 fairly or accurately characterize representations made by UTCP with respect to PureCycle technology and deny that any UTCP employee made any false representations.

19.     Defendants deny the allegations in Paragraph 19, except as follows.  Defendants admit that UTCP and Raser entered into a Sourcing and Development Agreement dated April 6, 2007; and that UTCP and Thermo entered into a Purchase Contract and a Service Agreement on August 31, 2008.  Defendants deny that the allegations in Paragraph 19 fully and accurately characterize the contents of those agreements, which speak for themselves, and refer to the agreements for the full contents thereof.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations as to Raser's decision concerning what power generation system it should purchase and therefore leave Plaintiffs to their proof.

20.     Defendants deny the allegations in Paragraph 20.

21.     Defendants deny the allegations in Paragraph 21, except admit that Defendants provided certain performance guarantees of PureCycle units based on specific operating parameters set forth in the Purchase Contract; that these operating parameters were established based on information provided by Plaintiffs as to the geothermal resources available at the Thermo No. 1 site; and that UTCP's knowledge of the geothermal resources available at the

-6-

Thermo No. 1 site was based solely on representations made or information provided by Plaintiffs.

22.     Defendants deny that the allegations in Paragraph 22 fairly and accurately characterize statements made by UTCP to Plaintiffs and deny that UTCP made any false representations to Plaintiffs.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether any statement was "of great importance" to Raser and therefore leave Plaintiffs to their proof.  Any remaining allegations in Paragraph 22 are denied.

23.     Defendants deny the allegations in Paragraph 23 except as follows.  Defendants admit that one BTU is the amount of energy required to raise the temperature of one pound of water by 1°F; that the energy output of 1 kilowatt hour will run a 1 kilowatt device for 1 hour; that the ratio described in the sixth sentence in Paragraph 23 is a generally accurate description of the efficiency of a geothermal power plant; that the efficiency of a geothermal generator is dependent on, among other factors, the efficiency of the heat exchanger and the efficiency of the cycle; and that the laws of thermodynamics apply to the process of converting geothermal energy into electric power.  Defendants further deny that the allegations in Paragraph 23 fairly and accurately characterize statements made by UTCP to Plaintiffs with respect to the efficiency of PureCycle units and deny that UTCP made any false representations to Plaintiffs.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether any statement was important to Raser and the cycle efficiency of a comparable Ormat system and therefore leave Plaintiffs to their proof.  Any remaining allegations in Paragraph 23 are denied.

SL1 1106764v1 104188.00002

24.     Defendants deny that the allegations in Paragraph 24 fairly and accurately characterize statements made by UTCP to Plaintiffs and deny that UTCP made any false representations to Plaintiffs.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences in Paragraph 24, and therefore leave Plaintiffs to their proof, except deny the allegation regarding "UTCP's inability to solve those problems."  Any remaining allegations in Paragraph 24 are denied.

25.     Defendants deny that the allegations in Paragraph 25 fairly and accurately characterize statements made by UTCP to Plaintiffs and deny that UTCP made any false representations to Plaintiffs.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 25 and therefore leave Plaintiffs to their proof.  Any remaining allegations in Paragraph 25 are denied.

26.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence in Paragraph 26 and therefore leave Plaintiffs to their proof.  Defendants deny that the allegations in the first two sentences of Paragraph 26 fully and accurately characterize the operation of PureCycle units at the Thermo plant, and deny that the allegations in the last sentence of Paragraph 26 fairly and accurately characterize statements made by UTCP to Plaintiffs.  Defendants further deny that UTCP made any false representations to Plaintiffs.  Any remaining allegations in Paragraph 26 are denied.

27.     Defendants deny that the allegations in the first sentence in Paragraph 27 fairly and accurately characterize statements made by UTCP to Plaintiffs and deny that UTCP made any false representations to Plaintiffs.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 27 and therefore leave Plaintiffs to their proof.

-8-

28.     Defendants deny that the second sentence in Paragraph 28 fully and accurately characterizes the contents of any letter from PWPS to Raser, and refer to such letter for the complete terms thereof.  Defendants deny the remaining allegations in Paragraph 28, except admit that at the time that Thermo contracted to purchase PureCycle units, UTCP had limited operating experience with such units and that the 50-unit project was substantially larger than previous installations.  Defendants deny that UTCP made any false representations to Plaintiffs.

29.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 and therefore leave Plaintiffs to their proof, except deny that the allegations in Paragraph 29 fairly and accurately characterize statements made by UTCP to Plaintiffs and deny that UTCP made any false representations to Plaintiffs.

30.     Defendants deny that the allegations in Paragraph 30 fairly and accurately characterize statements made by UTCP to Plaintiffs and deny that UTCP made any false representations to Plaintiffs.  Defendants admit that representatives of Plaintiffs and PWPS had discussions regarding a bottom-cycling process that had the potential ability to increase the net output of the Thermo plant, and that in such a process, hot water from the well that circulates through one PureCycle unit is sent through another PureCycle unit to capture some of the remaining heat.  Defendants admit that John Fox of UTCP sent an e-mail dated December 21, 2009 to Messrs. Brown and Clayton of Raser addressing bottom-cycling, but deny that the allegations in Paragraph 30 fairly and accurately characterize that e-mail, which speaks for itself, and refer to the e-mail for the full contents thereof.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding the time and money spent on implementing the bottom-cycling process and therefore leave Plaintiffs to their proof.  All remaining allegations in Paragraph 30 are denied.

31.      Defendants deny the allegations in Paragraph 31.

32.      Defendants deny the allegations in Paragraph 32, except admit that after UTCP's rights and obligations under its agreements with Plaintiffs were assigned to PWPS, PWPS President Peter Christman visited and took a tour of the Thermo plant.

33.      Defendants deny the allegations in Paragraph 33.

## Count I

34.–38.  Defendants deny the allegations in Paragraphs 34 through 38.

## Count II

39.–43.  Defendants deny the allegations in Paragraphs 39 through 43.

## Count III

44.      Defendants deny the allegations in Paragraph 44.

## Count IV

45.      Defendants admit the allegations in Paragraph 45.

46.      Defendants deny the allegations in Paragraph 46.

47.      Defendants deny the allegations in Paragraph 47.

## Count V

48.      Defendants deny the allegations in Paragraph 48.

## Count VI

49.      Defendants deny the allegations in Paragraph 49.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

50.      The Complaint, and each cause of action therein, fails to state a claim upon which relief can be granted.

SL1 1106764v1 104188.00002

## Second Affirmative Defense

51.     Plaintiffs' claims in Counts I and II are barred to the extent they are based on alleged misrepresentations which are statements of opinion rather than statements of fact.

## Third Affirmative Defense

52.     Plaintiffs' claims in Counts I, II and III are barred by the integration clauses in the Purchase Contract and the Service Agreement, each of which provides that the agreement constitutes the entire contract between the parties with respect to the subject matter thereof and supersedes all prior proposals, representations, quotations, agreements and understandings, written and oral.

## Fourth Affirmative Defense

53.     Plaintiffs' reliance, if any, on the alleged misrepresentations was not justifiable because Plaintiffs were aware, through, among other things, their own knowledge, experience and expertise, their due diligence, and the reports of their own experts, of the risks and uncertainties relating to the adequacy and sufficiency of the geothermal resources available at the Thermo site to support the Thermo plant.

## Fifth Affirmative Defense

54.     Plaintiffs' reliance, if any, on the alleged misrepresentations was not justifiable because they were aware, through, among other things, their own knowledge, experience and expertise, their due diligence, and one or more expert reports, of the risks and uncertainties inherent in the use of PureCycle technology at the Thermo plant.

## Sixth Affirmative Defense

55.     Plaintiffs' claims in Counts I, II, III and VI are barred because their alleged losses were not proximately caused by Defendants, but rather by Plaintiffs' own decision to proceed

SL1 1106764v1 104188.00002

with the construction of the Thermo plant notwithstanding the risks and uncertainties resulting

from the fact that they had not confirmed that the Thermo site had adequate and sufficient

geothermal resources to support the Thermo plant.

<u>**Seventh Affirmative Defense**</u>

56.     Plaintiffs are barred from recovery on their claims in Counts II, III and VI in

whole or in part under the doctrines of contributory and/or comparative negligence because their

alleged damages were proximately caused by their own negligent conduct, carelessness or other

wrongdoing, including without limitation:  (a) their decision to enter into a contract guaranteeing

minimum output to the City of Anaheim without having confirmed that the Thermo site had

adequate and sufficient geothermal resources to support Thermo's obligations under the contract;

(b) their decision to enter into a contract with the City of Anaheim guaranteeing that Thermo

would commence production by early 2009 notwithstanding that the production schedule was far

more accelerated than any that had been previously accomplished and that Plaintiffs had not

confirmed that the Thermo site had adequate and sufficient geothermal resources to support

Thermo's obligations under the contract; (c) their decision to raise capital from lenders and

investors based on representations regarding the projected output of the Thermo plant without

having confirmed that the Thermo site had adequate and sufficient geothermal resources to

support those projections; (d) their decision to purchase PureCycle units from UTCP before they

had confirmed that the Thermo site had adequate and sufficient geothermal resources to support

Thermo's obligations under its contract with the City of Anaheim; (e) their failure to use

employees and staff with sufficient knowledge and skill to operate the Thermo plant; (f) their

failure to adhere to the requirements of the operating and maintenance manuals and instructions

provided by UTCP and PWPS or to otherwise operate and maintain PureCycle units consistent

SL1 1106764v1 104188.00002

with standard industry practice; (g) their failure to provide adequate information to UTCP and PWPS with respect to geothermal resources, well field development, and other operating conditions at the Thermo site; and (h) their failure to adequately plan for effective well field development and plant construction, to procure appropriate balance of plant equipment, and to complete the balance of plant and well field development within necessary time frames.

### Eighth Affirmative Defense

57.     Plaintiffs' claims in Counts I, II and III are barred by the doctrine of ratification because Plaintiffs, with full knowledge of all material facts, entered into amendments as late as December of 2009 to the contracts at issue in this case, represented that the contracts remained valid and binding obligations of Plaintiffs, induced Defendants to perform under such contracts, accepted such performance, and received the benefits of Defendants' performance under the contracts.

### Ninth Affirmative Defense

58.     Plaintiffs' claims based on alleged deficiencies in PureCycle units are barred because two independent testing agencies conducted commissioning tests which confirmed that each of the units met the technical specifications and capacity guarantees set forth in the Purchase Contract.

### Tenth Affirmative Defense

59.     Under the terms of the Purchase Contract and Service Agreement, Plaintiffs' damages with respect to all claims related to those agreements are expressly limited in contract and tort to the price allocable in the Purchase Contract to any equipment that was the cause of any loss or damage to Plaintiffs, and Defendants are further held harmless under the Purchase

-13-

Contract and Service Agreement from any loss, damage, or delay due to any reasonably unforeseeable cause beyond the reasonable control of Defendants.

### Eleventh Affirmative Defense

60.     Plaintiffs' claims for any special, incidental, indirect or consequential damages of any nature whatsoever, including without limitation, business interruption, lost profits, revenues or sales, or increased costs of production, whether such claims are based in contract, warranty or tort, including negligence, or any other legal theory or principle, are barred by the limitation of liability and consequential damages set forth in the Purchase Contract and the Service Agreement.

### Twelfth Affirmative Defense

61.     Plaintiffs' claims in Counts IV and V are barred because the Purchase Contract disclaims any liability "arising directly or indirectly from or in connection with [Thermo's] drawings and related materials, or UTCP's review and/or comment on said drawings or related materials," and Thermo assumed responsibility "in all respects for the design of the installation and for the installation of the Equipment."

### Thirteenth Affirmative Defense

62.     Plaintiffs' claims in Counts I, II and III are barred in whole or in part by the equitable doctrine of estoppel because Plaintiffs, with full knowledge of all material facts, entered into the contracts at issue in this case, entered into amendments to the contracts, induced Defendants to perform under such contracts, accepted such performance, and received the benefits of Defendants' performance under the contracts.

SL1 1106764v1 104188.00002

## Fourteenth Affirmative Defense

63.      Plaintiffs' claims in Counts I, II and III are barred in whole or in part by the

equitable doctrine of waiver because Plaintiffs, with full knowledge of all material facts, entered

into the contracts at issue in this case, entered into amendments to the contracts, induced

Defendants to perform under such contracts, accepted such performance, and received the

benefits of Defendants' performance under the contracts.

## Fifteenth Affirmative Defense

64.      Plaintiffs failed to mitigate damages.

## Sixteenth Affirmative Defense

65.      Plaintiffs' claims in Counts I, II and III are barred, in whole or in part, by the

statute of limitations.

## Seventeenth Affirmative Defense

66.      Plaintiffs are barred from maintaining this action under the doctrine of unclean

hands.

## COUNTERCLAIMS

67.      Counterclaim-Plaintiffs UTC Power Corporation ("UTCP") and Pratt & Whitney

Power Systems, Inc. ("PWPS") bring these counterclaims against Counterclaim-Defendants

Raser Technologies, Inc. n/k/a Cyrq Energy, Inc. ("Raser"), Thermo No. 1 BE-01, LLC

("Thermo") and RZTI Litigation, LLC ("RZTI") and against additional counterclaim-defendants

Via Motors, Inc. f/k/a Via Automotive, Inc. ("Via"), Kraig T. Higginson ("Higginson") and

Richard D. Clayton ("Clayton").  For avoidance of doubt, these counterclaims do not seek and

should not be construed to seek any relief against Raser or Thermo that is precluded by the

Findings of Fact, Conclusions of Law and Order Confirming the Third Amended Plan of

-15-

Reorganization of Raser Technologies, Inc. and its Affiliated Debtors entered on August 30, 2011 (Docket No. 401) ("Confirmation Order") in *In re Raser Technologies, Inc., et al.*, Case No. 11-11315 (KJC) (Bankr. D. Del.) (the "Bankruptcy Case").

## PARTIES

1.      Counterclaim-Plaintiff UTCP is a Delaware corporation with its principal place of business in South Windsor, Connecticut.

2.      Counterclaim-Plaintiff PWPS is a Delaware corporation with its principal place of business in East Hartford, Connecticut.

3.      On information and belief, Counterclaim-Defendant Raser is a Delaware corporation with its principal place of business in Salt Lake City, Utah.

4.      On information and belief, Counterclaim-Defendant Thermo is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah.

5.      On information and belief, Counterclaim-Defendant RZTI is the assignee of the claims asserted by Raser and Thermo in this action.  As such, RZTI's claims are subject to the same defenses, rights of setoff and rights of recoupment as are the claims of Raser and Thermo. All requests for relief herein made against Raser and Thermo are also directed against RZTI, to the extent that RZTI is the assignee of the claims of Raser and Thermo.

6.      On information and belief, Counterclaim-Defendant Via is a Delaware corporation with its principal place of business in Orem, Utah.

7.      On information and belief, Counterclaim-Defendant Higginson is a citizen of Utah.  On information and belief, Higginson was Chairman of the Board of Directors of Raser from October 2003 until December 3, 2010 and was a member of the Board of Directors of Raser

until February 11, 2011.  On information and belief, in or about December 2010, Higginson

accepted a position as a senior executive of Via.

8.      On information and belief, Counterclaim-Defendant Clayton is a citizen of Utah.

On information and belief, Clayton was the Executive Vice President, General Counsel and

Secretary of Raser from March 2007 until his resignation effective November 30, 2010.  On

information and belief, in or about December 2010, Clayton accepted a position as a senior

executive of Via.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over these Counterclaims pursuant to 28 U.S.C.

§§ 1334 and 1367 and principles of pendent and ancillary jurisdiction.

10.      Venue is proper in this District under 28 U.S.C. § 1409 and principles of pendent

and ancillary venue.

## BACKGROUND FACTS

**A.      The Applicable Agreements**

11.      Pursuant to a Purchase Contract (the "Purchase Contract") between UTCP and

Thermo dated August 31, 2008, Thermo agreed to purchase from UTCP fifty (50) PureCycle

geothermal water heat-to-electricity systems for a total contract price of $15,925,000.

12.      On information and belief, Thermo is and was an indirect subsidiary of Raser, a

Utah-based company that had two lines of business – a power systems segment that focused on

developing and constructing geothermal power plants, and a transportation and industrial

segment that focused on developing and commercializing Raser's electromagnetic machine and

power electronic drive technologies, which are used to increase the torque, power and efficiency

in electric motors, generators and machines.

-17-

13.     Pursuant to a Reimbursement Agreement (the "Reimbursement Agreement") made as of August 31, 2008 between Raser and UTCP, Raser agreed among other things to "backstop" the payment obligations of Thermo under the Purchase Contract.

14.     In order to secure Raser's obligations to UTCP under the Reimbursement Agreement, Raser and Raser's subsidiary RT Patent Company, Inc. ("RT Patent") granted to UTCP a continuing first priority security interest in and lien upon, among other things, all of RT Patent's right, title and interest in and to all patents and patent applications identified on Schedule A ("Schedule A") to the Reimbursement Agreement (the "Patents").  Schedule A identifies the following Patents:

     1.     Resonant Motor System – U.S. Patent No. 6,847,186

     2.     Electromagnetic Motor – U.S. Patent No. 7,034,499

     3.     Motor Controller – U.S. Patent No. 7,026,785

     4.     Pancake Motor – U.S. Patent No. 7,116,029

     5.     Hydrodynamic Slip Ring – U.S. Patent No. 7,019,431.

The Patents also include any material invention made or developed by, or for the benefit of, Raser, its affiliates or subsidiaries even if not identified on Schedule A.

15.     UTCP properly perfected its security interest in the Patents identified on Schedule A by duly filing UCC financing statements with the Delaware Department of State and patent assignments with the United States Patent and Trademark Office.

16.     All of UTCP's rights and obligations under the Reimbursement Agreement were fully assigned to and assumed by PWPS pursuant to an Assignment and Assumption Agreement dated as of April 1, 2009.  Raser and Thermo each consented in writing to such assignment and assumption.

-18-

17.     Raser and PWPS entered into Amendment No. 1 of Reimbursement Agreement as of December 4, 2009.  Pursuant to that amendment, the parties amended Section 1(e) of the Reimbursement Agreement to provide as follows:

> Notwithstanding the foregoing provisions, if: (i) By February 16, 2010 a Performance Test, as defined by the Purchase Contract, has not been carried out by Thermo or its agents; or (ii) by February 28, 2010 Thermo has not received the full amount of the Grant, as defined in the Purchase Contract, or is otherwise unable or fails to make any payment to UTCP in accordance with the Purchase Contract; then in either case Raser shall become immediately responsible for payment in full of an amount equal to twenty-seven percent (27%) of the Total Contract Price, as defined in the Purchase Contract, to UTCP, without the requirement of any notice, claim, or demand by UTCP and without any right of Raser to dispute or adjust such amount.  Payment of such amount by Raser to UTCP shall be secured as provided by Section 2 of this Agreement as if such obligation were a finally determined Reimbursement obligation of Raser based on a Reimbursement Claim under this Agreement.

**B.      Raser's Breach of the Reimbursement Agreement**

18.     By February 16, 2010, no Performance Test had been carried out by Thermo or its agents.  Accordingly, Raser became immediately responsible under the Reimbursement Agreement, as amended, for payment in full of $4,299,750, representing an amount equal to 27% of the Total Contract Price as defined in the Purchase Contract.  Raser's obligation was secured by PWPS's security interest in the Patents.

19.     By letter dated July 1, 2010, PWPS made demand upon Raser for immediate payment of $4,299,750 pursuant to the Reimbursement Agreement, as amended.

20.     Raser defaulted on its obligations under the Reimbursement Agreement, as amended, by failing to make payment of any part of the amount due.  The full amount of $4,299,750, plus the applicable contractual interest rate of 1.5% per month since July 1, 2010, remains due and owing to PWPS.

C.      Raser's Sale of Assets to Via and Dissipation of the Proceeds from the Sale of
        PWPS's Collateral

21.     On November 18, 2010, nearly four months after receiving notice of default and demand for payment from PWPS, Raser entered into an Asset Purchase Contract and Shareholders' Agreement with Via pursuant to which Via purchased Raser's transportation and industrial segment assets for $2.5 million in cash, assumption of liabilities of about $700,000, and issuance to Raser of about 39% of the common shares of Via.  The purchased assets included the Patents.  On information and belief, the Patents comprised the most valuable part of the purchased assets and represented a large portion, if not all, of the purchase price.

22.     Section 2(b) of the Reimbursement Agreement provided that if Raser or RT Patent were to sell or transfer any of the "Collateral" including the Patents, "Raser and RT Patent hereby agree that the security interests granted under this Agreement shall immediately attach to the proceeds of any such sale, transfer or liquidation and they shall each take such immediate action as necessary to preserve the security interest of UTCP."

23.     On information and belief, Higginson and Clayton each knew that at the time the Raser-Via transaction was being negotiated that he would be offered a senior executive position at Via if the transaction was consummated, and each had a personal interest in the successful completion of the transaction separate and apart from his interest as an executive of Raser. Higginson and Clayton each was aware that PWPS had sent the July 1, 2010 letter making a demand for amounts due under the Reimbursement Agreement and that the claim was secured by a first priority security interest in the Patents.

24.     Higginson and Clayton each in fact was offered and accepted a senior executive position with Via either immediately upon closing of the transaction or shortly thereafter.

-20-

25.     Raser, Higginson, Clayton and Via each was aware of the terms of the Reimbursement Agreement, that PWPS, as assignee of UTCP, had a security interest in the Patents including but not limited to the Patents identified in Schedule A, and that Raser was obligated to take steps as necessary to preserve the security interest of PWPS in the proceeds from sale of the Patents.

26.     On information and belief, Raser would not have entered into the transaction if it could not access the cash proceeds of the transaction.  On information and belief, Higginson, Clayton and Via each was aware that the transaction would proceed only if Raser had unfettered access to the proceeds of the transaction.  Accordingly, Raser, Higginson, Clayton and Via each knew and understood that upon closing of the transaction, Raser would dishonor its obligation to protect PWPS's security interest in the proceeds of the sale of the Patents and to take such immediate action as necessary to preserve the security interest of PWPS in such proceeds.  Each knew and understood that Raser intended to use the proceeds of the sale of the Patents for its own benefit, and to the detriment and prejudice of PWPS.

## FIRST COUNTERCLAIM FOR RELIEF
### (Amounts due under the Reimbursement Agreement – Against Raser, RZTI and Via)

27.     Counterclaim-Plaintiffs repeat and incorporate by reference paragraphs 1-26 of these Counterclaims as if fully set forth herein.

28.     Raser breached its obligations under the Reimbursement Agreement by failing to pay $4,299,750 plus applicable interest thereon, all of which sums remain due and owing.

29.     Pursuant to Article 9 of the Delaware Uniform Commercial Code (or other applicable state commercial law) and applicable patent law, PWPS, on its own behalf and on behalf of UTCP, is entitled to foreclose its security interest in the Patents in partial satisfaction of Raser's debt under the Reimbursement Agreement.  Under Section 9-601(a)(1) of the Uniform

-21-

Commercial Code, in addition to any rights contained in the Reimbursement Agreement, PWPS

may, at its option, foreclose or otherwise enforce its security interest by any available judicial

procedure.

30.     If PWPS or UTCP has any liability to Raser on account of the claims asserted in

this action, which liability is denied, and to the extent the proceeds from sale of the Patents are

insufficient to satisfy Raser's obligations under the Reimbursement Agreement, Counterclaim-

Plaintiffs may offset against any liability to Raser on account of such claims all amounts due

from Raser pursuant to the Reimbursement Agreement.

31.     Alternatively, if PWPS or UTCP has any liability to Raser on account of the

claims asserted in this action, which liability is denied, and to the extent the proceeds from sale

of the Patents are insufficient to satisfy Raser's obligations under the Reimbursement

Agreement,  Counterclaim-Plaintiffs may recoup and deduct from any liability to Raser on

account of such claims all amounts due from Raser to PWPS pursuant to the Reimbursement

Agreement.

WHEREFORE, Counterclaim-Plaintiffs demand judgment on the First Counterclaim and

request that the Court enter the following relief:

A.     Against Via:

(i)     Appoint a special master to advertise and conduct a judicial foreclosure
auction sale of the Patents, free and clear of any rights of Via and
Counterclaim-Plaintiffs, with the security interest to attach to the proceeds
of any sale to a third party; and authorize Counterclaim-Plaintiffs to credit
bid the secured claim up to the sum of $4,299,750 at the special master's
sale;

(ii)    In the alternative, declare that Counterclaim-Plaintiffs are entitled to
conduct a secured party's public sale of the Patents pursuant to Section 9-
610 of the Uniform Commercial Code on twenty (20) days' notice to Via,
Raser and any other parties that may have an interest in the Patents and
notice by appropriate publication;

(iii)    Declare that such disposition of the Patents will be a commercially reasonable disposition of the Patents;

(iv)    Award Counterclaim-Plaintiffs their costs including reasonable attorneys' fees; and

(v)    Award such other and further relief as is just and equitable.

C.    Against Raser and RZTI:

(i)    If Counterclaim-Plaintiffs are found liable on any claim to Raser or to RZTI as its assignee, and to the extent the proceeds from any sale or other disposition of the Patents are insufficient to satisfy Raser's obligations under the Reimbursement Agreement, directing that Counterclaim-Plaintiffs may offset against any liability to Raser or RZTI on account of such claims all amounts due from Raser pursuant to the Reimbursement Agreement;

(ii)    In the alternative, to the extent the proceeds from any sale or other disposition of the Patents are insufficient to satisfy Raser's obligations under the Reimbursement Agreement, directing that Counterclaim-Plaintiffs may recoup and deduct from any liability to Raser or RZTI on account of such claims all amounts due from Raser pursuant to the Reimbursement Agreement;

(iii)    To the extent permitted by the Confirmation Order, award Counterclaim-Plaintiffs their costs including reasonable attorneys' fees; and

(iv)    Award such other and further relief as is just and equitable and consistent with the Confirmation Order.

**SECOND COUNTERCLAIM FOR RELIEF**
**(Fraud and Fraudulent Nondisclosure – Against Raser, RZTI, Higginson and Clayton)**

32.    Counterclaim-Plaintiffs repeat and incorporate by reference paragraphs 1-31 of these Counterclaims as if fully set forth herein.

33.    Higginson, Clayton and, on information and belief, other executives of Raser acting in their capacity as executives of Raser, engaged in a scheme to defraud Counterclaim-Plaintiffs by transferring the Patents to a third party, Via, for the benefit of Raser, and for the benefit of Higginson and Clayton, acting in their personal interests and not in their interests as

-23-

executives of Raser, and permitting the proceeds of such sale to be dissipated rather than safeguarded for the benefit of Counterclaim-Plaintiffs.

34.    Higginson, Clayton and Raser had a duty to disclose to Counterclaim-Plaintiffs the sale of the Patents and the use and disposition of the proceeds from the sale of the Patents, and to take such steps as necessary to preserve the security interest in the proceeds from the sale of the Patents.

35.    Higginson, Clayton and Raser breached their duties to Counterclaim-Plaintiffs by failing to disclose their conduct to Counterclaim-Plaintiffs and in failing to take steps necessary to preserve the security interest in the proceeds from the sale of the Patents.  Instead, Higginson, Clayton and Raser appropriated such proceeds for the direct benefit of Raser and the indirect benefit of Higginson and Clayton, who upon closing of the transaction accepted senior executive positions with Via.

36.    In justifiable reliance on the understanding and expectation that Raser would comply with its obligations under the Reimbursement Agreement, and without knowledge of the true intent of Higginson, Clayton and Raser as set forth above, Counterclaim-Plaintiffs were not able to take affirmative steps to protect their security interest in the proceeds from sale of the Patents and prevent the dissipation of those proceeds.

37.    Raser, Higginson and Clayton, through their fraudulent conduct described above, proximately caused damages to Counterclaim-Plaintiffs.

38.    Such damages include without limitation that the proceeds from the sale of the Patents were dissipated and, on information and belief, the current value of the Patents is substantially less than the allocable share of the purchase price for the sale of the Patents and other assets to Via.

-24-

WHEREFORE, Counterclaim-Plaintiffs demand judgment on the Second Counterclaim and request that the Court enter the following relief:

A.   Against Higginson and Clayton:

(i)   Award compensatory damages;

(ii)   Award punitive damages;

(iii)   Award Counterclaim-Plaintiffs their costs including reasonable attorneys' fees; and

(iv)   Award such other and further relief as is just and equitable.

B.   Against Raser and RZTI:

(i)   If Counterclaim-Plaintiffs are found liable on any claim to Raser or to RZTI as its assignee, directing that Counterclaim-Plaintiffs may offset against any liability to Raser or RZTI on account of such claims the amount of all damages suffered as a result of Raser's misconduct as alleged above;

(ii)   In the alternative, directing that Counterclaim-Plaintiffs may recoup and deduct from any liability to Raser or RZTI on account of such claims the amount of all damages suffered as a result of Raser's misconduct as alleged above;

(iii)   To the extent permitted by the Confirmation Order, award Counterclaim-Plaintiffs their costs including reasonable attorneys' fees; and

(iv)   Award such other and further relief as is just and equitable and consistent with the Confirmation Order.


### THIRD COUNTERCLAIM FOR RELIEF
### (Tortious Interference with Contract – Against Via, Higginson and Clayton)

39.   Counterclaim-Plaintiffs repeat and incorporate by reference paragraphs 1-38 of these Counterclaims as if fully set forth herein.

40.   The Reimbursement Agreement was a valid and binding contract between Raser and Counterclaim-Plaintiffs.

-25-

41.     In and before November 2010, Via, Higginson and Clayton had actual knowledge of the Reimbursement Agreement, including knowledge of Counterclaim-Plaintiffs' security interest in the Patents, and of Raser's obligation to take such steps as were necessary to preserve the security interest in the proceeds from the sale of the Patents.

42.     Via, Higginson and Clayton knew that Via's purchase of Raser's assets could be effectuated only if Raser had free and unencumbered access to the full cash proceeds of the sale, even though this would require Raser to breach its obligations under the Reimbursement Agreement.

43.     Via, Higginson and Clayton intentionally and improperly procured the breach of the Reimbursement Agreement by Raser.

44.     In so acting, Higginson and Clayton were acting in furtherance of their personal interests and with the expectation that they would accept senior executive positions with Via, and outside the scope of their authority as agents of Raser.

45.     The wrongful conduct of Via, Higginson and Clayton as alleged above proximately caused damages to the Counterclaim-Plaintiffs.

46.     Such damages include without limitation that the proceeds from the sale of the Patents were dissipated and, on information and belief, the current value of the Patents is substantially less than the allocable share of the purchase price for the sale of the Patents and other assets to Via.

WHEREFORE, Counterclaim-Plaintiffs demand judgment on the Third Counterclaim against Via, Higginson and Clayton and request that the Court enter the following relief:

(i)     Award compensatory damages;

(ii)    Award punitive damages;

-26-

(iii)    Award Counterclaim-Plaintiffs their costs including reasonable attorneys' fees; and

(iv)    Award such other and further relief as is just and equitable.

## FOURTH COUNTERCLAIM FOR RELIEF
### (Breach of Contract – Against Thermo and RZTI)

47.    Counterclaim-Plaintiffs repeat and incorporate by reference paragraphs 1-5 and 9-11 of these Counterclaims as if fully set forth herein.

48.    UTCP entered into a Service Agreement with Thermo as of August 31, 2008 pursuant to which UTCP agreed to provide certain services with respect to PureCycle geothermal water heat-to-electricity systems that Thermo purchased from UTCP, and Thermo agreed to pay UTCP for such services in accordance with the terms of the Service Agreement.

49.    All of UTCP's rights and obligations under the Service Agreement were fully assigned to and assumed by PWPS pursuant to an Assignment and Assumption Agreement dated as of April 1, 2009.

50.    At the time Raser and Thermo commenced the Bankruptcy Case on April 29, 2011, Thermo was in default under the Service Agreement for failure to pay amounts due under the Service Agreement.  Thermo further breached the agreement by failing to make payments due after the commencement of the Bankruptcy Case.  Effective as of August 30, 2011, Thermo rejected the Service Agreement pursuant to Section 365 of the U.S. Bankruptcy Code, 11 U.S.C. § 365, which constituted a further breach of the Service Agreement.

51.    Thermo is obligated to Counterclaim-Plaintiffs in the amount of $909,302, plus the applicable contractual interest rate of 1.5% per month, for the period through August 30,

2011, and has failed to pay any portion of such amount.  Thermo also is liable to Counterclaim-Plaintiffs for damages based on its rejection of the Service Agreement.

52.     If Counterclaim-Plaintiffs have any liability to Thermo on account of the claims asserted in this action, which liability is denied, Counterclaim-Plaintiffs may offset against any liability to Thermo on account of such claims all amounts due from Thermo pursuant to the Service Agreement, to the extent such amounts are not paid as administrative expenses in the Bankruptcy Case.

53.     Alternatively, if Counterclaim-Plaintiffs have any liability to Thermo on account of the claims asserted in this action, which liability is denied, Counterclaim-Plaintiffs may recoup and deduct from any liability to Thermo on account of such claims all amounts due from Thermo pursuant to the Service Agreement, to the extent such amounts are not paid as administrative expenses in the Bankruptcy Case.

WHEREFORE, Counterclaim-Plaintiffs demand judgment on the Fourth Counterclaim against Thermo and RZTI and request that the Court enter the following relief:

(i)     If Counterclaim-Plaintiffs are found liable on any claim to Thermo or to RZTI as its assignee, directing that Counterclaim-Plaintiffs may offset against any liability on account of such claims all amounts due from Thermo pursuant to the Service Agreement, to the extent such amounts are not paid as administrative expenses in the Bankruptcy Case;

(ii)    In the alternative, directing that Counterclaim-Plaintiffs may recoup and deduct from any liability to Thermo or to RZTI as its assignee on account of such claims all amounts due from Thermo pursuant to the Service Agreement, to the extent such amounts are not paid as administrative expenses in the Bankruptcy Case;

(iii)   To the extent permitted by the Confirmation Order, award Counterclaim-Plaintiffs their costs including reasonable attorneys' fees; and

(iv)    Award such other and further relief as is just and equitable and consistent with the Confirmation Order.

Counterclaim-Plaintiffs demand trial by jury.

Dated: Wilmington, Delaware
       October 20, 2011

STEVENS & LEE, P.C.


_/s/ Joseph H. Huston, Jr._
Joseph H. Huston, Jr. (No. 4035)
Maria Aprile Sawczuk (No. 3320)
1105 North Market Street, Suite 700
Wilmington, DE  19801
Telephone:  (302) 425-3310; -3306
Telecopier:  (610) 371-7972
E-mail: jhh@stevenslee.com
       masa@stevenslee.com


-and-

DAY PITNEY LLP

Thomas D. Goldberg (*admitted pro hac vice*)
Grace Lee (*admitted pro hac vice*)
One Canterbury Green
201 Broad Street
Stamford, CT  06901
Telephone: (203) 977 7383
Telecopier: (203) 977 7301
E-mail: tdgoldberg@daypitney.com
       glee@daypitney.com


*Counsel for UTC Power Corporation and*
*Pratt & Whitney Power Systems, Inc.*

SL1 1106764v1 104188.00002